_____
                                                    )
MIT FINANCIAL GROUP, INC., et al.,                  )
                                                    )
        Plaintiffs,                                 )
                                                    )
v.                                                  )        Civil Action No. 10-10463-PBS
                                                    )
WILLIAM M. PALMER, et al.,                          )
                                                    )
        Defendants,                                 )
                                                    )
v.                                                  )
                                                    )
ADELINO CERVEIRA, et al.,                           )
                                                    )
        Counterclaim Defendants.                    )
_____)


REPORT AND RECOMMENDATION ON
MOTIONS FOR SUMMARY JUDGMENT

March 6, 2012

SOROKIN, M.J.

Pending before the Court is Counterclaim Plaintiffs William M. Palmer and Maria Palmer's

("the Palmers") Motion for Partial Summary Judgment as to Counts 2, 5, and 6 of the Palmers'

Counterclaim. (Doc. 48). Also pending before the Court is the Motion for Summary Judgment of

Plaintiffs Adelino Cerveira ("Cerveira") and MIT Financial Group, Inc. ("MIT, Inc."). (Doc. 83).

I RECOMMEND that the Palmers' Motion be DENIED IN PART AND ALLOWED IN PART and

that Plaintiffs' Motion be DENIED in all but one respect for the following reasons.

I.      FACTUAL AND PROCEDURAL BACKGROUND

        William Palmer is Maria Palmer's only child and her sole family caretaker. (Doc. 57 at ¶ 2).

At all material times, William Palmer has held a Durable Power of Attorney to handle Maria Palmer's affairs, including but not limited to financial transactions. (Doc. 100 at ¶ 6). Maria Palmer has lived in her home at 9 Winchester Terrace, Jamaica Plain, Massachusetts ("Subject Property") for nearly forty years. (Doc. 57 at ¶ 2). On August 7, 1998, William Palmer was deeded onto the Subject Property, reserving a life estate for Maria Palmer. (Doc. 100 at ¶ 7). The Subject Property has been William Palmer's principal residence since the early 2000s. (Doc. 57 at ¶ 2). Due to Maria Palmer's medical care, the Palmers' financial condition deteriorated to the point where a foreclosure proceeding began with respect to a home equity loan on the Subject Property. Id. at ¶¶ 3, 5. William Palmer initially negotiated a forbearance but the foreclosure proceeding was renewed in the spring of 2007. Id. at ¶ 6. The Subject Property was also subject to a variety of liens and encumbrances. (Doc. 100 at ¶ 9). At this time, the Palmers had a mortgage of about $66,000 and other lien debt of about $114,000. (Doc. 57, Ex. 1 at 30).

MIT Financial Group, LLC ("MIT, LLC") sent postcards to individuals who potentially may have benefitted from the knowledge of the company's services and also to real estate professionals. (Doc. 80, Ex. 9 at ¶ 3). The Palmers received a solicitation postcard from MIT, LLC in April 2007.[1] (Doc. 57 at ¶ 7). The postcard stated that: "MIT Financial Group works with 'Private' and 'Speciality' lenders;" that "MIT Financial Group is capable of refinancing nearly any situation" and that MIT Financial Group was "Helping Distressed Home Owners in All 50 States" with "Better Lending . . ." (Doc. 57, Ex. 1 at 22-23).

---

[1] Plaintiffs state that they have no knowledge as to how the Palmers received the postcard. (Doc. 80, Ex. 9 at ¶ 3). However, the Palmers attach as an exhibit to their Motion for Partial Summary Judgment a solicitation postcard that they received from MIT, LLC addressed to Maria Palmer with MIT, LLC's return address. (Doc. 57, Ex. 1 at 22-23).

William Palmer contacted MIT, LLC via the phone number listed on the postcard in March or April of 2007 to assist in stopping the foreclosure. (Doc. 57 at ¶¶ 14-15; Doc. 80, Ex. 2 at ¶ 6). Matthew Ceradini returned his call. (Doc. 57 at ¶ 14). Ceradini is the Vice President of MIT, Inc. (Doc. 80, Ex. 2 at ¶ 2). Ceradini and Palmer often communicated via email concerning these arrangements. (Doc. 80, Exs. 13-20, 24). Ceradini's emails were sent from the address mceradini@mitfinancialgroup.com.[2] (Doc. 80, Exs. 16-17, 20, 24). On April 17, 2007, Ceradini sent William Palmer a general authorization form that was on the letterhead of MIT, Inc. (Doc. 57 at ¶ 19). The authorization and the email by which Ceradini sent the authorization form linked to the website of MIT, LLC. Id. William Palmer did not realize that there was a second, separate legal entity with which he was dealing until many months after the Note and Mortgage were signed. Id. at ¶ 21. No date is given for MIT, Inc.'s incorporation. MIT, LLC was officially dissolved in December 2007. (Doc. 80, Ex. 9 at ¶ 2). Adelino Cerveira was a member of MIT, LLC and is the President of MIT, Inc. Id. at ¶¶ 2, 4. MIT, LLC and MIT, Inc. also employed the same CPA. (Doc. 80, Ex. 25 at 2). MIT, Inc. and MIT, LLC had the same phone number. (Doc. 57, Ex. 1 at 23, 29). Palmer asserts that MIT, LLC and MIT, Inc. acted as a single, commingled entity as demonstrated by their response to his communications and their shared phone numbers and personnel. (Doc. 57 at ¶ 32).

By the end of April 2007, Ceradini took certain information from William Palmer concerning the Palmers' income, debts, history of lawsuits for debts, and such as part of the application process. Id. at ¶ 25. William Palmer reported that he earned approximately $750 per week, that his mother

---

[2] MIT, LLC maintained a website at www.mitfinancialgroup.com. (Doc. 57, Ex. 1 at 23). MIT, Inc. maintains a website at http://mitfinancialgroupinc.com. Id. at 24. MIT, Inc.'s website address differs from that of MIT, LLC's only in that it includes "inc" after "mitfinancialgroup."

received $4,600 per month in social security and government annuities, and that the Palmers had rental income of about $1,500 per month. (Doc. 80, Ex. 1 at 42-44; Doc. 80, Ex. 2 at ¶ 27). In support of their application, the Palmers submitted a Uniform Residential Loan Application ("URLA") dated July 25, 2007. (Doc. 57, Ex. 2 at 4-6). On the URLA, the Palmers revealed the following liabilities, totaling $180,674: (1) $66,750 to Sovereign Bank; (2) $26,447 to the Commonwealth of Massachusetts Department of Revenue; (3) $25,641 to Unifund CCR, Kream & Kream; (4) $7,501 to Midland Credit Management, Zwicker & Associates; (5) $4,458 to Suite 500 Associates, Paul A. Palermino; (6) $5,579 to Martindale-Hubbell, Cohn & Dussi; (7) $5,985 to Care Solutions, Laurence K. Richmond; (8) $25,463 to Suffolk County Tax; and (9) $13,850 to MBNA America Bank, N.A. Id. at 5, 7. The only asset listed by the Palmers on the URLA was the Subject Property which was assigned a value of $550,000. Id. at 5.

MIT, Inc. offered the Palmers a foreclosure "bailout" which was stated to be a bridge loan intended for short term use only to assist the Palmers in rectifying their financial situation. (Doc. 100 at ¶ 10). The funds for the loan came from Donna Hoadley. (Doc. 80, Ex. 2 at ¶ 10). Hoadley herself borrowed this money from a bank at an interest rate of 7.49%. (Doc. 119, Ex. 1 at 11). Hoadley never met nor directly communicated with the Palmers, Ceradini, or Cerveira. (Doc. 119, Ex. 1 at 13). Her only contact with MIT, Inc. was via Theresa Martini. (Doc. 119, Ex. 1 at 13). The HUD-1 Settlement Statement lists Martini as a mortgage broker receiving a $2,400 fee; she has not appeared in this litigation. (Doc. 57, Ex. 1 at 30). The undisputed evidence establishes that Hoadley had never originated a real estate loan prior to the one to the Palmers. Id. At the hearing, William Palmer, appearing for himself pro se and as counsel for Maria Palmer, conceded that he has no evidence suggesting Hoadley's knowing participation in the fraud or misrepresentations he alleges

the other Counterclaim Defendants committed.

On July 26, 2007, William Palmer and William Palmer as holder of a Durable Power of Attorney for Maria Palmer executed an Interest Only Balloon Note ("Note") in favor of Hoadley in the amount of $240,000. (Doc. 80, Ex. 3). MIT, Inc. was the escrow agent for Hoadley. (Doc. 80, Ex. 2 at ¶ 26). The Note required six monthly interest only payments of $2,598 with a balloon payment of the $240,000 principal due February 1, 2008.[3] (Doc. 73 at 4). The Palmers also entered into a mortgage on the Subject Property ("Mortgage") that secured the Note and was dated July 26, 2007. Id. at 5.

The benefit of the "bailout" provided by the Note is not obvious. Most of the Note's proceeds, $180,000 of the $240,000 borrowed, simply converted existing debts into the 12.99% interest Note. (Doc. 57, Ex. 1 at 30). Of the remaining $60,000, $10,000 was held back for home repairs, $18,000 was held back to prepay the monthly interest only payments for the first six months of the Note, and $21,000 was disbursed as fees to Hoadley and MIT, Inc. related entities.[4] Id. MIT, Inc. asserts that the transaction improved the Palmers' financial condition such that they were positioned to obtain a conventional mortgage as a result of the ballon loan, however, the record is devoid of evidence establishing that the Palmers, before the transaction, could not have obtained a conventional fixed rate mortgage to pay off their existing debts.

---

[3] Including insurance and real estate taxes, the Palmers' monthly housing expenses were $2,973.33. (Doc. 57 Ex. 2 at 5). Prior to executing the Note, the Palmers' monthly housing expenses were $833.33. Id.

[4] Although the HUD-1 Settlement Statement states that Hoadley received both a loan discount of 1% totaling $2,400 and a loan origination fee of 4% totaling $9,600 (doc. 57, ex. 1 at 30), Hoadley testified that she never received the loan origination fee (doc. 119, ex. 2 at 4). This appears to be a potentially serious error committed by the parties to the HUD-1 Settlement Statement responsible for disposition of the Note's proceeds. See 18 U.S.C. § 1001.

The Palmers also signed a document entitled Escrow Letter - Home Repair Escrow on July 26, 2007. (Doc. 80, Ex. 7). Pursuant to the letter, $10,000 was to be held back in escrow at the closing for roof and other repairs to the property. Id. These funds were held by MIT, Inc. as escrow agent for Hoadley. (Id.; Doc. 80, Ex. 23). Plaintiffs assert that the Palmers selected the contractor after completing their own due diligence and bid selections. (Doc. 80, Ex. 2 at ¶ 24). The Palmers state that they were not offered a choice of contractor. (Doc. 57 at ¶ 45). The repairs were completed by FitzGerald Contracting Co. Id. at ¶ 46.

Pursuant to the terms of the Note, "Nonpayment of any installment of principal and/or interest due under this Note when due and payable, which nonpayment shall have continued for more than ten (10) days" shall constitute an Event of Default. (Doc. 86, Ex. 8 at ¶ 6(B)). "Upon the occurrence of any Event of Default, this Note, at the option of the Holder, shall become immediately due and payable without presentment, demand, protest or notice of any kind, all of with [sic] are hereby expressly waived by Borrower and by every Guarantor." Id. at ¶ 6(C).

> [T]he Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Borrower will pay the legal and other fees and expenses of the Holder reasonably incurred in connection with or incidental to . . . the enforcement of any of the obligations of Borrower or rights of the Holder under this Note, the Security Instruments or any other agreement, document or instrument now or hereafter executed in connection herewith, by litigation or otherwise; and all such fees and expenses shall be indebtedness under this Note and shall be secured by the Security Instrument.

Id. at ¶ 6(E).

In October or November of 2007, Hoadley was contacted by Martini on behalf of Cerveira and was told there were issues with the property and that Cerveira was going to buy her out because they were leery on the investment. (Doc. 119, Ex. 1 at 12-13). On November 9, 2007, Hoadley

assigned the Note and Mortgage to Cerveira.[5]  (Doc. 73 at 9).  Cerveira borrowed money from family members to fund the assignment of the Note.  (Doc. 80, Ex. 25 at 2).  Hoadley then entered into a second loan arranged by MIT, Inc.  (Doc. 119, Ex. 1 at 9-12).

The parties dispute whether the Palmers ever extended the loan.  Plaintiffs assert that the Palmers did so on three separate occasions.  (Doc. 80, Ex. 2 at ¶ 13).  The Palmers assert that in February 2008 they were told by Cerveira that they were in default and would owe the default rate of $3,600 per month but that they would accept the sum of $2,598 as forbearance payments with the remaining interest accruing.  (Doc. 96 at 4).  A statement of accounts generated by MIT, Inc. on December 8, 2008, indicates that the Palmers were unable to satisfy the terms of the Note on the date the Note was due (February 1, 2008) and that this constituted an Event of Default under the Note, triggering a default interest rate of 18% to be applied to the outstanding principal until such time as the principal is paid in full.  (Doc. 91 at 1).

The Palmers stopped making payments on the Note in March 2009 after MIT, Inc. indicated that it was proceeding with a foreclosure action.  (Doc. 80, Ex. 1 at 14-15).

MIT, Inc. and Cerveira filed a Complaint in Suffolk County Superior Court asserting one claim against the Palmers for default on the Note on January 26, 2010.  (Doc. 1 at 8-13).  The Palmers removed the case to this Court on March 17, 2010.  Id. at 1-4.  On March 24, 2010, the Palmers filed their Answer and a Counterclaim against MIT, Inc. and Cerveira.  (Doc. 3).  The Counterclaim was amended on May 4, 2010, to include claims against Martini, Hoadley, and Ceradini.  (Doc. 8).  On May 11, 2011, the Clerk entered a Notice of Default against Martini.  (Doc.

---

[5] The Note required all monthly payments to be made to Hoadley at her address.  (Doc. 80, Ex. 3 at 1).  Following the Assignment, the Palmers were directed to address all payments under the Note to MIT, Inc.  (Doc. 80, Ex. 8 at 9).

66).

II.     STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a) .  Once a party has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who "may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial." Barbour v. Dynamics Research Corp., 63 F.3d 32, 37 (1st Cir. 1995) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).  Moreover, the Court  is "obliged to []view the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor." LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993).  Even so, the Court is to ignore "conclusory allegations, improbable inferences, and unsupported speculation." Sullivan v. City of Springfield, 561 F.3d 7, 14 (1st Cir. 2009) (quotation omitted).  "The presence of cross-motions does not alter this general standard.  When there are cross-motions for summary judgment, the court must consider each motion separately, drawing all inferences in favor of each non-moving party in turn." D&H Therapy Assocs., LLC v. Boston Mut. Life Ins. Co., 640 F.3d 27, 34 (1st Cir. 2011).

III.    DISCUSSION

As an initial matter, at the hearing on the motions, all parties agreed that the Court may conclusively resolve any issue on which any party had moved.

A.  Plaintiffs' Motion for Summary Judgment and Its Affirmative Claim

Plaintiffs' Complaint contains one count for default on the Note.  Plaintiffs, Cerveira and MIT Inc., assert that, as of January 20, 2010, the Palmers "owe Cerveira and [MIT, Inc.]

$267,061.27 in principal, interest, and late charges on the Note plus continuing interest at [sic] costs and attorney's fees." (Doc. 1 at 12).

Once a plaintiff-promisee produces a promissory note and establishes the genuineness of the defendant-promisor's signature and the amount due, the plaintiff is ordinarily entitled to summary judgment unless the opposing party is able to set forth specific facts showing an affirmative defense or a genuine issue for trial. Guinness Import Co. v. De Stefano, 518 N.E.2d 858, 858-59 (Mass. App. Ct. 1988).

Plaintiffs have adequately produced the promissory note. William Palmer admitted to signing the Note and Mortgage on his own behalf as well as Maria Palmer's while acting under the durable power of attorney. (Doc. 86, Ex. 3 at 10-11). William Palmer also admitted that he stopped making payments under the Note. (Doc. 80, Ex. 1 at 14).

In the Note, the Palmers promise to pay $240,000 to Hoadley. (Doc. 80, Ex. 3 at 1). No mention is made of MIT, Inc. in the Note. The Note was secured by the Mortgage. The Mortgage addresses only Hoadley and the Palmers. (Doc. 80, Ex. 4). Although the Mortgage is to be returned to MIT, Inc. following its recording, MIT, Inc. is not named in the Mortgage itself. Id. at 1. As it is not a named party to either the Note or the Mortgage nor is it a holder of the Note, MIT, Inc. has failed to produce evidence that it may maintain an action for violation of the Note. Accordingly, I RECOMMEND that the Court find that the Palmers have prevailed on affirmative defense number 3 asserted against count I of the Complaint and DISMISS MIT, Inc.'s claims against the Palmers.

Hoadley assigned the Note and Mortgage to Cerveira and he is the current holder of the Note. Nonetheless, two reasons prevent entry of summary judgment in Cerveira's favor on the only count in his Complaint. First, as explained below, the Palmers' prevail on some of their affirmative

defenses/counterclaims which may defeat, in whole or part, the claim to enforce the Note, depending upon the remedies determined by the Court. Second, Palmer has asserted additional affirmative defenses and counterclaims that, if successful, would or could defeat the claim to enforce the Note. No party moved for summary judgment on these claims or defenses so the Court is in no position to rule.

Accordingly, I RECOMMEND that the Court DENY the Plaintiffs' Motion for Summary Judgment.

B. The Palmers' Motion for Partial Summary Judgment

In their affirmative defenses and counterclaims, the Palmers contend that the Note and Mortgage are predatory under the Massachusetts Predatory Home Loan Practices Act (the "Act"), Mass. Gen. Laws ch. 183C. (Doc. 8 at 4, 43-44). Pursuant to section 18 of the Act, an aggrieved borrower may bring a civil action for injunctive relief or damages for a violation of the Act. Mass. Gen. Laws ch. 183c, § 18(b). The court may, as it considers appropriate:

> (1) issue an order or injunction rescinding a home mortgage loan contract which violates this chapter, or barring the lender from collecting under any home mortgage loan which violates this chapter; (2) issue an order or injunction barring any judicial or non judicial foreclosure or other lender action under the mortgage or deed of trust securing any home mortgage loan which violates this chapter; (3) issue an order of injunction reforming the terms of the home mortgage loan to conform to this chapter; (4) issue an order or injunction enjoining a lender from engaging in any prohibited conduct; or (5) impose such other relief, including injunctive relief, as the court may consider just and equitable.

Id. § 18(c). Thus, available remedies under the Act include rescission and reformation, as the court deems appropriate. Id.

1. Claims Against Matthew Ceradini

The Palmers have failed to cite any evidence that Ceradini acted as a lender or creditor within the meaning of the Massachusetts Predatory Home Loan Practices Act. See infra. Ceradini's conduct may satisfy the "solicits" prong of the broker definition of the Act, however, the Palmers have not cited evidence that Ceradini received compensation, directly or indirectly, as the Act requires. They have also failed to address whether liability under the Act attaches to Ceradini rather than (or as well as) his employer MIT, Inc on whose behalf he acted. Finally, they have failed to cite any evidence that Ceradini, personally, engaged in any unfair method of competition or unfair or deceptive act or practice in the conduct of any trade or commerce, in violation of Chapter 93A.

Accordingly, I RECOMMEND that the Court DENY the Palmers' Motion for Partial Summary Judgment against Ceradini as to all claims and DISMISS Counts II and VI of the Palmers' Counterclaim against Ceradini.

2. Predatory Home Loan Practices Act - Counterclaim Count 2 and Affirmative Defense 11

The Massachusetts Predatory Home Loan Practices Act governs the terms and conditions of "high cost home mortgage loans," like the one at issue here.[6] The Palmers assert that Cerveira,

_____

[6] The parties agree that the loan at issue is properly defined as a high cost home mortgage loan. A loan is a "high cost home mortgage loan" if it is "a consumer credit transaction that is secured by the borrower's principal dwelling, other than a reverse mortgage transaction" and it meets either of two conditions:

(i) the annual percentage rate at consummation will exceed by more than 8 percentage points for first-lien loans, or by more than 9 percentage points for subordinate-lien loans, the yield on United States Treasury securities having comparable periods of maturity to the loan maturity as of the fifteenth day of the month immediately preceding the month in which the application for the extension of credit is received by the lender; and when calculating the annual percentage rate for adjustable rate loans, the lender shall use the interest rate that would be effective once the introductory rate has expired.

MIT, Inc. and Hoadley violated eight provisions of the Act, specifically sections 3, 4, 6, 7, 8, 9, 11, and 14.

i. Sections 4, 11, and 14

Sections 4, 11, and 14 govern the affordability of a loan, prohibit fees for extensions of a loan, and establish standards for disbursements to home improvement contractors. These three provisions of the Act apply only to "lenders" or "brokers." Mass. Gen. Laws ch. 183C, §§ 4, 11, 14. The Act defines a "lender" as "an entity that originated 5 or more home mortgage loans within the past 12 month period or acted as an intermediary between originators and borrowers on 5 or more home mortgage loans within the past 12 month period[.]" Id. § 2. A "lender shall also mean a broker." Id. A "broker" is "any person who for compensation directly or indirectly solicits, processes, places or negotiates home mortgage loans for others or who closes home mortgage loans which may be in the person's own name with funds provided by others and which loans are thereafter assigned to the person providing the funding of the loans[.]" Id.

MIT, Inc.

The undisputed evidence establishes that MIT, Inc. was a "broker" within the meaning of the statute. For compensation, i.e. the fees it received, it directly processed and negotiated the Palmers' home mortgage loan. Moreover, the postcard it sent demonstrates that MIT, Inc. was in the business of soliciting, processing, placing, or negotiating home mortgage loans for others, i.e.

---

(ii) Excluding either a conventional prepayment penalty or up to 2 bona fide discount points, the total points and fees exceed the greater of 5 per cent of the total loan amount or $400; the $400 figure shall be adjusted annually by the commissioner of banks on January 1 by the annual percentage change in the Consumer Price Index that was reported on the preceding June 1.

Mass. Gen. Laws ch. 183C, § 2.

the "private" and "specialty" lenders with which it said it worked.[7]

MIT, Inc. is an entity and the definition of a broker requires a "person." However, while "person" is not defined within the Act, it is defined in the Massachusetts Code. Unless a contrary intention clearly appears, in construing Massachusetts statutes the word "person" "shall include corporations, societies, associations and partnerships." Mass. Gen. Laws ch. 4, § 7. The statute at issue reveals no such contrary intention.

There is no need to determine whether MIT, Inc. qualifies as a "lender" because, by definition, a lender includes a broker.

Hoadley

Hoadley is neither a broker nor a lender. The record is devoid of any evidence supporting the application of either definition to her. Accordingly, I RECOMMEND that the Court DENY the Palmers' Motion for Partial Summary Judgment against Counterclaim Defendant Hoadley with respect to sections 4, 11, and 14 of the Act.

Cerveira

Likewise, Cerveira does not meet the definition of a broker because, although the funds provided for the assignation were provided by family members, the Note and Mortgage were not thereafter assigned to the people providing the funding. (Doc. 80, Ex. 25 at 2). The Palmers have produced no evidence of Cerveira's role brokering other transactions or his involvement in the requisite number of transactions to satisfy the definition of a lender.

However, Section 15(a) of the Act provides that, subject to certain affirmative defenses not

---

[7] Given that MIT, LLC and MIT, Inc. shared the same phone number, overlapping employees and, most importantly, that MIT, Inc. responded to the inquiry generated by MIT, LLC's postcard, any contention that the postcard is not attributable to MIT, Inc. is unavailing.

at issue here, "[a]ny person who purchases or is otherwise assigned a high-cost home mortgage loan shall be subject to all affirmative claims and any defenses with respect to the loan that the borrower could assert against the original lender or broker of the loan[.]" Mass. Gen. Laws ch. 183C, § 15(a). Section 15(b) provides, in relevant part, that "[l]imited to amounts required to reduce or extinguish the borrower's liability under the high-cost home mortgage loan plus amounts required to recover costs, including reasonable attorneys' fees, a borrower acting only in an individual capacity may assert claims that the borrower could assert against a lender of the home loan against any subsequent holder or assignee of the home loan[.]" Id. § 15(b). Thus, Cerveira, as assignee of the Note, is subject to any affirmative claims or defenses with respect to the Note that the Palmers could assert against MIT, Inc., the original broker. See In re Mae, 460 B.R. 1, 3 (Bankr. D. Mass. 2011). Therefore, if MIT, Inc. is liable for a violation of sections 4, 11, or 14 of the Act, Cerveira is also liable as an assignee of the Note. Id. § 15.

a. Section 4

Section 4 of the Act provides:

A lender shall not make a high-cost home mortgage loan unless the lender reasonably believes at the time the loan is consummated that 1 or more of the obligors, will be able to make the scheduled payments to repay the home loan based upon a consideration of the obligor's current and expected income, current and expected obligations, employment status, and other financial resources other than the borrower's equity in the dwelling which secures repayment of the loan.

There shall be a presumption that the borrower is able to make the scheduled payments if, at the time the loan is made, and based on the monthly payments as calculated based on the index plus the margin at the time the loan is made, in the case of loans with lower introductory rates: (1) the borrower's scheduled monthly payments on the loan, including principal, interest, taxes, insurance, and assessments, combined with the scheduled payments for all other debt, do not exceed 50 per cent of the borrowers documented and verified monthly gross income, if the borrower has sufficient residual income as defined in the guidelines established in 38 CFR 36.4337(e) and VA form 26-6393 to pay essential monthly expenses after paying the

scheduled monthly payments and any additional debt.

Mass. Gen. Laws ch. 183C, § 4.

The Note has a section titled "Payments." (Doc. 80, Ex. 2 at 1). This section provides for monthly interest only payments beginning on September 1, 2007. Id. It further provides that "If, on **February 1st, 2008**, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the 'Maturity Date.'" Id. (emphasis in the original). Plainly, the "scheduled payments to repay the home loan" include this $240,000 balloon payment.

At the time that the Note was executed, MIT, Inc. reasonably believed, based on Ceradini's conversation with William Palmer, that the Palmers had an estimated monthly income of $9,325. (Doc. 80, Ex. 1 at 42-44; Doc. 80, Ex. 2 at ¶ 27). There is no evidence in the record that MIT, Inc. had any reason to believe that the Palmers' monthly income would change following the Note's execution. Prior to the execution of the Note, the Palmers had total liabilities of $180,674 and monthly housing expenses of $833.33. (Doc. 57, Ex. 2 at 5, 7). Following the Note's execution, the Palmers had monthly housing expenses (payment under the note, real estate taxes, and insurance) of $2,973.33 for the six months prior to the balloon payment. Id. at 5. There is no evidence that the Palmers had any assets other than the Subject Property either before or after the Note's execution.

The Counterclaim Defendants argue that the Palmers had the ability to make the payments under the Note as their monthly income was more than three times the monthly payment due on the Note. The Counterclaim Defendants, however, do not take into account the balloon payment due under the Note at the end of the six month period. Averaging the balloon payment over the six-month length of the Note and adding it to the monthly housing expenses results in a monthly payment of $42,973.33. Thus, there is no presumption that the Palmers were able to make the

scheduled monthly payments as their monthly debt payments exceeded fifty percent of the Palmers'

monthly income and, in fact, was more than four times the Palmers' monthly income.  See Mass.

Gen. Laws ch. 183C, § 4.

MIT, Inc. and Cerveira argue that this was a "bailout" or "bridge" loan provided to the

Palmers to enable the Palmers to restore their credit to obtain a conventional mortgage.  This

argument runs afoul of the statute.  Essentially, MIT, Inc. and Cerveira assert that the Palmers could

repay the balloon loan by tapping into the equity in the home in the form of obtaining a conventional

home mortgage loan, but the statute specifically says the borrower must be able to repay from

resources "other than the borrower's equity in the dwelling which secures repayment of the loan."

Id.  Thus, MIT, Inc. and Cerveira cannot base their reasonable belief upon the equity that remained

in the Palmers' dwelling.

Accordingly, I RECOMMEND that the Court ALLOW the Palmers' Motion for Partial

Summary Judgment against Counterclaim Defendants Cerveira and MIT, Inc. with respect to section

4 of the Act and likewise determine the Palmers have prevailed on affirmative defense number 11

asserted against count I of the Complaint with respect to section 4 of the Act.

b.  Section 11

Pursuant to section 11 of the Act, "[a] lender shall not charge a borrower a fee or other

charge to modify, renew, extend or amend a high-cost home mortgage loan or to defer a payment

due under the terms of a high-cost home mortgage loan."  Mass. Gen. Laws ch. 183C, § 11.  The

Balloon Rider provides that upon the Note's maturity:

> in the event that the mortgage has been paid on time for the full term of the loan, the
> borrower(s) may request a six month extension of the loan. . . . Upon accepts [sic]
> of the extention [sic] by the lender, the mortgage will be modified and the
> borrower(s) will be responsible for a one percent (1.000%) lender origination charge

payable to Frank Delprete.[8]

(Doc. 57, Ex. 2 at 8).

Counterclaim Defendants have produced evidence that the Palmers were never charged a fee to extend the Note, although the Palmers extended the Note on three separate occasions.[9] (Doc. 80, Ex. 2 at ¶¶ 13-14). This section does not provide a blanket prohibition for including such a term in a high cost home mortgage loan, instead it only prohibits the enforcement of such a provision. Because the Palmers were never charged a fee for an extension, if any extension occurred, I RECOMMEND that the Court DENY the Palmers' Motion for Partial Summary Judgment against Counterclaim Defendants Cerveira and MIT, Inc. with respect to section 11 of the Act and affirmative defense number 11 with respect to section 11 of the Act. I also RECOMMEND that the Court DISMISS the Palmers' Counterclaim against Counterclaim Defendants Cerveira and MIT, Inc. with respect to section 11 of the Act. I further RECOMMEND that the Court ALLOW the Plaintiffs' Motion for Summary Judgment as to affirmative defense number 11 with respect to

---

[8] Counterclaim Defendants assert that the Balloon Rider was mistakenly carried over from a non-residential loan transaction given by Frank Delprete and was not intended to be included in the Palmers' loan package. (Doc. 80, Ex. 2 at ¶ 28). The Balloon Rider was signed by both William Palmer and William Palmer as holder of a Durable Power of Attorney for Maria Palmer. (Doc. 57, Ex. 2 at 8). The first paragraph of the Balloon Rider states:

> THIS BALLOON RIDER is made this 26th day of July, 2007, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Note to Donna Hoadley ("Lender") of the same date and covering the property described in the Security Instrument and located at: 9 Winchester Terrace, Jamaica Plain, MA 02130.

Id.

[9] The Palmers dispute that the Note was ever extended past the original due date. (Doc. 96 at 4).

section 11 of the Act.

c.  Section 14

Section 14 of the Act provides that:

A lender shall not pay a contractor under a home improvement contract from the proceeds of a high cost home mortgage loan other than (i) by an instrument payable to the borrower or jointly to the borrower and contractor, or (ii) at the election of the borrower, through a third party escrow agent in accordance with terms established in a written agreement signed by the borrower, the lender and the contractor before the disbursement of funds.

Mass. Gen. Laws ch. 183C, § 14.

MIT, Inc. has not argued that it paid the contractor by an instrument payable to the Palmers or jointly to the Palmers and the contractor.  Instead, MIT, Inc. argues that it has complied with section 14 because the Palmers signed the Escrow Letter - Home Repair Escrow.  However, the Escrow Letter - Home Repair Escrow was only signed by the Palmers.  To be compliant with the requirements of section 14, such an agreement must be signed by the borrower, the lender, and the contractor.  MIT, Inc. also makes an argument that the contractor did not perform any home improvement but was instead making badly needed repairs.  Such a distinction is not material for purposes of this statute.  Any repair of the Subject Property would naturally be a home improvement.  That the home repairs were, in fact, done reasonably and properly, as asserted by Plaintiffs and disputed by the Palmers are factual questions bearing on the appropriate remedy for this violation not whether a violation occurred.

Accordingly, I RECOMMEND that the Court ALLOW the Palmers' Motion for Partial Summary Judgment against Counterclaim Defendants Cerveira and MIT, Inc. with respect to section 14 of the Act and likewise determine the Palmers have prevailed on affirmative defense number 11 asserted against count I of the Complaint with respect to section 14 of the Act.

ii. Section 3

Section 3 of the Act provides in relevant part:

> A creditor may not make a high-cost home mortgage loan without first receiving certification from a counselor with a third-party nonprofit organization approved by the United States Department of Housing and Urban Development, a housing financing agency of this state, or the regulatory agency which has jurisdiction over the creditor, that the borrower has received counseling on the advisability of the loan transaction. . . A high cost home mortgage loan originated by a lender in violation of this section shall not be enforceable.  At or before closing a high cost home mortgage loan, the lender shall obtain evidence that the borrower has completed an approved counseling program.

Mass. Gen. Laws ch. 183C, § 3.   The undisputed evidence establishes that no one obtained the certification required by the statute and that no such counseling occurred.  Nonetheless, the sentence rendering unenforceable loans "originated by a lender" without the required certification does not apply in this case.  Hoadley was the originator and she was not a "lender" within the meaning of the statute.  And, neither MIT, Inc. nor Cereivra originated this loan.

However, the statute also provides that a <u>creditor</u> who makes a high-cost home mortgage loan without first obtaining the required certification shall be subject to the general remedies of section 18 of the Act.  The Act does not define the term "creditor."  Black's Law Dictionary gives the following definition: "One to whom a debt is owed; one who gives credit for money or goods[.]" BLACK'S LAW DICTIONARY 375 (7th ed. 1999).  Hoadley qualifies as a creditor under the Act. Although Cerveira also qualifies as a creditor, this section is not applicable to him as he did not originate or make the Note.[10]  <u>See</u> Mass. Gen. Laws ch. 183C, § 3 ("A creditor may not <u>make</u> a high-

---

[10]  Even though as asssignee, Cerveira is subject to many claims and defenses, in this case, the Palmers cannot assert section 3 of the Act against him.  Section 15(a) provides, in relevant part, that "[a]ny person who purchases or is otherwise assigned a high-cost home mortgage loan shall be subject to all affirmative claims and any defenses with respect to the loan that the borrower could assert against the original lender or broker of the loan[.]" Mass. Gen. Laws ch. 183C, § 15(a).  An assignee may only be held liable for any affirmative claims or

cost home mortgage loan without first receiving [the required] certification[.]") (emphasis added);

Maldonado v. AMS Servicing LLC, Nos. 11-40044-FDS, 11-40219-FDS, 2012 U.S. Dist. LEXIS

8037, at *12 n.5 (D. Mass. Jan. 24, 2012) (stating that because Chapter 183C concerns the liabilities

of a creditor who makes the home loan, the Court assumes that a claim of violation of section 3 of

the Act was asserted against the entity providing the funds for the loan).

Counterclaim Defendants also argue that they did not violate this section because the

purpose and intent of the counseling requirement is to protect unsuspecting borrowers, not

sophisticated borrowers such as the Palmers. There is nothing in this section limiting its application

to unsophisticated borrowers. That consideration may bear on the appropriate remedy for the

violation, but not on whether a violation occurred.

Thus, I RECOMMEND that the Court ALLOW the Palmers' Motion for Partial Summary

Judgment against Counterclaim Defendant Hoadley with respect to section 3 of the Act and that the

Court DENY the Palmers' Motion for Partial Summary Judgment against Counterclaim Defendants

Cerveira and MIT, Inc. with respect to section 3 of the Act. I also RECOMMEND that the Court

DISMISS the Palmers' Counterclaim against Counterclaim Defendants Cerveira and MIT, Inc. with

respect to section 3 of the Act. I further RECOMMEND that the Court find that the Palmers have

prevailed on affirmative defense number 11 with respect to section 3 of the Act.

---

defenses that the borrower could assert against the original lender or broker. Hoadley was not a
lender or a broker and the Palmers have no claim against MIT, Inc. under section 3. Similarly,
Section 15(b) provides, in relevant part, that "[l]imited to amounts required to reduce or
extinguish the borrower's liability under the high-cost home mortgage loan plus amounts
required to recover costs, including reasonable attorneys' fees, a borrower acting only in an
individual capacity may assert claims that the borrower could assert against a lender of the home
loan against any subsequent holder or assignee of the home loan[.]" Id. § 15(b). Thus an
assignee or holder may only be held liable for any claims that the borrower could assert against
the original lender or broker. Section 15 does not enable the Palmers to bring claims against the
current note holder that they may have against a "creditor."

iii.  Section 6

Section 6 of the Act provides "A high-cost home mortgage loan shall not include the financing of points and fees greater than 5 per cent of the total loan amount or $800, whichever is greater."  Mass. Gen. Laws ch. 183C, § 6.  Because the Loan amount was $240,000, in order to be compliant with section 6, the Loan's points and fees must total no more than $12,000.  Counterclaim Defendants do not dispute that the points and fees are greater than $12,000.  Instead Counterclaim Defendants argue that paragraph 5 of the Note provides an appropriate remedy in the event that fees are deemed too high pursuant to a particular state law.  Paragraph 5 of the Note states:

> If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me.  The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me.  If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

(Doc. 57, Ex. 1 at 2).

The Note violates the Act as written.  No provision in the Act excuses compliance with this section if the high-cost home mortgage loan contains a self-reforming provision such as that here.  The Court notes that this is not a case in which a law was enacted after the Note's execution with retroactive application.  The Act applies to high-cost home mortgage loans closed after November 7, 2004.  Darden v. Noyes, 27 Mass. L. Rep. 448, at *7 (Mass. Super. 2010).  The Note was executed on July 26, 2007.  Hence, section 6 of the Act was clearly applicable to the Note at the time of execution and Counterclaim Defendants are deemed to be aware of that fact.  See Atkins v. Parker, 472 U.S. 115, 130 (1985) ("All citizens are presumptively charged with knowledge of the law").

21

Accordingly, I RECOMMEND that the Court ALLOW the Palmers' Motion for Partial Summary Judgment against Counterclaim Defendants Hoadley, Cerveira, and MIT, Inc. with respect to section 6 of the Act and likewise determine the Palmers have prevailed on affirmative defense number 11 asserted against count I of the Complaint with respect to section 6 of the Act.

iv.  Section 7

Section 7 of the Act provides:

> A high-cost home mortgage loan shall not contain a provision that increases the interest rate after default.  This section shall not apply to interest rate changes in a variable rate loan otherwise consistent with the home loan documents provided that the change in the interest rate is not triggered by the event of default or the acceleration of indebtedness.

Mass. Gen. Laws ch. 183C, § 7.

The Note provides for "interest at a yearly rate of 12.99%."  (Doc. 57, Ex. 1 at 1).  "After the occurrence of an Event of Default . . . or upon maturity, the interest rate shall be equal to Eighteen Percent (18%) per annum."  Id. at 2.

Counterclaim Defendants argue that they are not in violation of section 7 because they have not sought to collect the default rate of interest; however, there is evidence they did seek to collect the higher rate.  (Doc. 99 at 1).  In any event, there is nothing in section 7 that limits its application only to those situations where the default interest rate is sought.  The Note clearly violates section 7 of the Act.  Cf. Darden, 27 Mass. L. Rep. at *13 (holding that section 5 of the Act which provides that "[a] high-cost home mortgage loan shall not contain any provision for prepayment fees or penalties" does not limit liability to situations where prepayment fees are actually charged; "rather, it merely prohibits the inclusion in a high-cost home mortgage loan of any prepayment fee").

Accordingly, I RECOMMEND that the Court ALLOW the Palmers' Motion for Partial

22

Summary Judgment against Counterclaim Defendants Hoadley, Cerveira, and MIT, Inc. with respect to section 7 of the Act and likewise determine the Palmers have prevailed on affirmative defense number 11 asserted against count I of the Complaint with respect to section 7 of the Act.

v. Section 8

Section 8 of the Act provides, in relevant part, "A high-cost home mortgage loan shall not contain a scheduled payment that is more than twice as large as the average of earlier scheduled payments[.]" Mass. Gen. Laws ch. 183C, § 8.

The Note provides for a principal of $240,000 and six monthly payments of $2,598 beginning on September 1, 2007, and ending on February 1, 2008, the "Maturity Date." (Doc. 57, Ex. 1 at 1). The Note states that it is "payable in full at maturity." Id. Upon maturity, the borrower "must repay the entire principal balance of the loan and unpaid interest then due." Id. Thus, after six months of interest only payments of $2,598, the borrower must make a final payment of $240,000, correctly described by the Palmers as more than ninety-two times as large as the average earlier scheduled payments.

Counterclaim Defendants assert that, because the purpose of the statute is to prevent borrowers from defaulting on their loan obligations because they are unable to make the balloon payment, they did not violate section 8 as the Palmers should have been able to make their payments without difficulty. However, section 8 is a blanket prohibition on making high cost home mortgage loans containing a scheduled payment more than twice as large as the average of earlier scheduled payments; the borrower's financial ability to make such a payment is not a factor this section takes into consideration.

Accordingly, I RECOMMEND that the Court ALLOW the Palmers' Motion for Partial

Summary Judgment against Counterclaim Defendants Hoadley, Cerveira, and MIT, Inc. with respect to section 8 of the Act and likewise determine the Palmers have prevailed on affirmative defense number 11 asserted against count I of the Complaint with respect to section 8 of the Act.

vi. Section 9

Section 9 of the Act provides:

A high-cost home mortgage loan shall not contain a demand feature that permits the lender to terminate the loan in advance of the original maturity date and to demand repayment of the entire outstanding balance, except in the following circumstances:

(1) there is fraud or material misrepresentation by the consumer in connection with the loan that is not induced by the lender, its employees, or agents;

(2) the consumer fails to meet the repayment terms of the agreement for any outstanding balance and after the consumer has been contacted in writing and afforded a reasonable opportunity to pay the outstanding balance as outlined within the repayment terms of the agreement; or

(3) there is any bona fide action or inaction by the consumer that adversely and materially affects the lender's security for the loan, or any right of the lender in such security as provided in the loan agreement.

Mass. Gen. Laws ch. 183C, § 9.

Counterclaim Defendants argue that they are not subject to this provision because they are not "lenders" or "brokers." Counterclaim Defendants also argue that the Palmers are barred from arguing for relief under this section because William Palmer fraudulently informed MIT, Inc. that Maria Palmer was mentally alert and was aware of the refinancing of the Subject Property and what was being done with the money.

A party's status as a lender or a broker is not determinative as to whether this section has been violated. Though the section pertains to high-cost home mortgage loans that permit the lender to terminate the loan in advance of the original maturity date, the section does not prohibit only a

lender from making such loans.  Cf. id. § 3 ("A creditor may not make a high-cost home mortgage

loan without first receiving [the required] certification[.]") (emphasis added).  Pursuant to the terms

of the Note, the holder has the ability to assign the Note.  Nothing prevented the assignation of the

Note to either a lender or a broker.  As written, the Note does not prevent a subsequent assignee who

is a lender or a broker from enforcing the demand feature.

This section provides exceptions for a demand feature in three enumerated instances.

However, these exceptions are to be laid out in the demand feature of the high cost home mortgage

loan itself.  This construct makes clear to the borrower under what circumstances the demand feature

may be invoked.

Accordingly, I RECOMMEND that the Court ALLOW the Palmers' Motion for Partial

Summary Judgment against Counterclaim Defendants Hoadley, Cerveira, and MIT, Inc. with respect

to section 9 of the Act and likewise determine the Palmers have prevailed on affirmative defense

number 11 asserted against count I of the Complaint with respect to section 9 of the Act.

3.  Chapter 93A - Counts 5 and 6

Pursuant to Chapter 93A, "[u]nfair methods of competition and unfair or deceptive acts or

practices in the conduct of any trade or commerce are hereby declared unlawful."  Mass. Gen. Laws

ch. 93A, § 2.  Individuals have a private right of action under the statute.  Id. § 9(1).  A violation of

the Predatory Loan Act "shall constitute a violation of chapter 93A."  Mass. Gen. Laws ch. 183C,

§ 18(a).

Hoadley

Hoadley asserts that she is not susceptible to a claim under Chapter 93A because she entered

into the loan as a private individual and thus her participation was not in a business context.  "The

proscription in § 2 of 'unfair or deceptive acts or practices in the conduct of any trade or commerce' must be read to apply to those acts or practices which are perpetrated in a business context." Lantner v. Carson, 373 N.E.2d 973, 977 (Mass. 1978). Chapter 93A "creates a sharp distinction between a business person and an individual who participates in commercial transactions on a private, nonprofessional basis." Id. at 976. "Whether a private individual's participation in an isolated transaction takes place in a 'business context,' must be determined from the circumstances of each case." Begelfer v. Najarian, 409 N.E.2d 167, 176 (Mass. 1980). To establish liability, the court assesses "the nature of the transaction, the character of the parties involved, and the activities engaged in by the parties." Id. Also relevant are "whether similar transactions have been undertaken in the past, whether the transaction is motivated by business or personal reasons (as in the sale of a home), and whether the participant played an active part in the transaction." Id.

In Begelfer v. Najarian, the Massachusetts Supreme Judicial Court addressed whether the defendants were persons engaged in trade or commerce under Chapter 93A. Id. at 175. The plaintiffs, who were engaged in the business of buying, selling, renting, constructing, and renovating residential properties, executed nine separate notes to various payees. Id. at 170. The nine notes were secured by a junior mortgage on real estate. Id. The defendants, who did not know the plaintiffs, were asked to participate in the loan by two of the other investors. Id. The plaintiffs did not pay the note when due and, after the defendants made a written demand for payment of the amount due, the plaintiffs commenced an action seeking a declaration that the note was void due to violation of the usury statute, Mass. Gen. Laws ch. 271, § 49, and that the violation of the statue was an unfair and deceptive act under Chapter 93A. Begelfer, 409 N.E.2d at 169. The court held that the plaintiffs had failed to prove that the defendants were "persons engaged in the conduct of any

trade or commerce" or that their participation took place in a business context. Id. at 176. The court relied on the fact that the defendants' participation in the real estate transaction underlying the loan was minimal, the defendants had no voice in negotiating the terms of the loan, the payments under the loan were made to an agent and not directly to the defendants, the defendants were solicited by other investors to participate in the loan, and the defendants were not active in the management of the loan. Id.

The evidence presented demonstrates that Hoadley did not participate in the loan and mortgage process other than to supply the money to fund the loan. (Doc. 80, Ex. 2 at ¶ 10). Accordingly, I RECOMMEND that the Court DENY the Palmers' Motion for Partial Summary Judgment against Counterclaim Defendant Hoadley with respect to their claim under Chapter 93A. I also RECOMMEND that the Court DISMISS the Palmers' Counterclaim against Counterclaim Defendant Hoadley with respect to their claim under Chapter 93A.

Cerveira

I RECOMMEND that the Court ALLOW the Palmers' Motion for Partial Summary Judgment against Counterclaim Defendant Cerveira with respect to their claim under Chapter 93A and likewise determine that the Palmers have prevailed on affirmative defense number 9 asserted against Count I of the Complaint. The evidence demonstrates that Cerveira's participation in the transactions at issue took place in a business context. See Begelfer, 409 N.E.2d at 176. Although Cerveira purchased the Note in his individual capacity, he stated that he did so because he gave his word to Hoadley and because the Palmers did not pay their bill and hold up to their obligation. (Doc. 80, Ex. 25 at 2). The only interactions in the record between Hoadley and Cerveira prior to the assignation occurred in Cerveira's capacity as a member of MIT, Inc. Also relevant is the fact

that Cerveira is the President of MIT, Inc., the Note servicer, and Cerveria's active part in the transactions at issue in that role.

### MIT, Inc.

I also RECOMMEND that the Court ALLOW the Palmers' Motion for Partial Summary Judgment against Counterclaim Defendant MIT, Inc. with respect to their claim under Chapter 93A and likewise determine that the Palmers have prevailed on affirmative defense number 9 asserted against Count I of the Complaint. The Note clearly violated Chapter 183C. Counterclaim Defendants agree that Hoadley did not participate in the loan and mortgage process other than to supply the money to fund the loan. (Doc. 80, Ex. 2 at ¶ 10). Hence, MIT, Inc. was responsible for the inclusion of the terms in the Note that violate Chapter 183C.

## III.  CONCLUSION

For the foregoing reasons, I recommend that the Court DENY IN PART AND GRANT IN PART the Palmers' Motion for Partial Summary Judgment. Specifically, I RECOMMEND that the Court:

- DENY the Palmers' Motion for Partial Summary Judgment against Counterclaim Defendant Ceradini and DISMISS Counts II and IV of the Palmers' Counterclaim against Ceradini;

- DENY the Palmers' Motion for Partial Summary Judgment against Counterclaim Defendant Hoadley with respect to sections 4, 11, and 14 of the Act and their claim under Chapter 93A;

- DENY the Palmers' Motion for Partial Summary Judgment against Counterclaim Defendant Cerveria with respect to sections 3 and 11 of the Act;

- DENY the Palmers' Motion for Summary Judgment against Counterclaim Defendant MIT, Inc. with respect to sections 3 and 11 of the Act;

- ALLOW the Palmers' Motion for Partial Summary Judgment against Counterclaim

Defendant Hoadley with respect to sections 3, 6, 7, 8, and 9 of the Act;[11]

- ALLOW the Palmers' Motion for Partial Summary Judgment against Counterclaim Defendant Cerveira with respect to sections 4, 6, 7, 8, 9, and 14 of the Act and their claim under Chapter 93A; and

- ALLOW the Palmers' Motion for Partial Summary Judgment against Counterclaim Defendant MIT, Inc. with respect to sections 4, 6, 7, 8, 9, and 14 of the Act and their claim under Chapter 93A.

I also RECOMMEND that the Court DENY Plaintiffs' Motion for Summary Judgment in all respects except as to affirmative defense number 11 with respect to section 11 of the Act. I RECOMMEND that the Court determine that the Palmers have prevailed on affirmative defense number 9 asserted against count I of the Complaint and that the Palmers have prevailed on affirmative defense number 11 with respect to sections 3, 4, 6, 7, 8, 9 and 14 of the Act asserted against count I of the Complaint. I further RECOMMEND that the Court DISMISS MIT, Inc.'s claims against the Palmers.

---

[11]  The undersigned recommends that the Court determine that certain provisions of the Note violate the Act. Section 18 of the Act allows an aggrieved borrower to bring a civil action for injunctive relief or damages for any violation of the Act. Mass. Gen. Laws ch. 183C, § 18(b). Hoadley was not a lender nor a borrower under the Act and did not participate in the Note process beyond providing funding, although she is a creditor within the meaning of section 3. The circumstances under which someone such as Hoadley may be liable for damages and the legal standards that govern any award of damages are legal questions that remain to be resolved, indeed the parties have not addressed these questions. Nothing in my suggested ruling is meant to suggest that these questions have been resolved.

If the Court agrees with the undersigned's Report and Recommendation, several issues remain for adjudication. The Palmers assert thirteen additional affirmative defenses to Count I of the Plaintiffs' Complaint as to which no party has moved. Likewise, the Palmers assert eleven additional claims in their Counterclaim as to which no party has moved. The Court must also determine the appropriate remedies for the Plaintiffs' and Counterclaim Defendants' violations of Chapter 183C and Chapter 93A.[12]

SO ORDERED.

        /s / Leo T. Sorokin
Leo T. Sorokin
UNITED STATES MAGISTRATE JUDGE

_____

[12] The Parties are hereby advised that under the provisions of FED. R. CIV. P. 72, any party who objects to these proposed findings and recommendations must file specific written objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation. See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271 (1st Cir. 1988); United States v. Emiliano Valencia-Copete, 792 F.2d 4 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603 (1st Cir. 1980); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); see also Thomas v. Arn, 474 U.S. 140 (1985).